In the Matter of MERVYN J. SCHWARTZ, an Attorney, Respondent. BAR ASSOCIATION OF ERIE COUNTY, Petitioner.

Fourth Department, May 19, 1966.

*John B. Walsh* (*Leonard F. Walentynowicz* of counsel), for petitioner.

*Boniello, Gellman, McNulty, Halpern & Anton* (*Harold Halpern* of counsel), for respondent.

*Per Curiam.* Respondent was admitted to the practice of law by this court in 1950. Prior thereto he had received a degree of Bachelor of Laws and had studied accounting for two or three years in a recognized University in this State. Following his admission to the Bar he worked for several years for his brother, Sigmund Schwartz, an attorney practicing in Buffalo. Subsequently, the two formed a partnership with one Smith which was dissolved in 1955 and respondent thereafter practiced as an individual.

At that time respondent assumed a substantial collection account for Alliance Mercantile Agency (Alliance) that had previously been handled by his brother. In the course of a year Alliance would place with respondent for collection some 750 or 800 individual accounts. It was the understanding that respondent would make monthly remittances to Alliance of moneys collected after deducting therefrom his commissions and disbursements. In October, 1960 the suspicions of Alliance led to termination of respondent's services and a demand that he make a complete accounting. It was some four or five months before this was completed. It showed a balance due Alliance of $16,430.28.

Respondent maintained two bank accounts — a personal account and a so-called collection account. Respondent admits that he commingled the funds of Alliance with his personal funds and there is no dispute that respondent appropriated moneys of Alliance in a sum exceeding $15,000. Upon the hearing respondent's only explanation was that " it must have been used up."

It was not until some seven or eight months later that these funds were completely repaid to Alliance. In the meantime the creditor was threatening to make complaint to the Bar Association or the District Attorney. The record establishes that a part of the repayments to Alliance was made by checks of respondent's brother. The balance was repaid by respondent.

It is against this background that we consider the next charge

against respondent. In April, 1958 a 13-year-old infant, Wayne Hendler, was seriously injured when struck by a motor vehicle. His father, Ralph Hendler, was the manager of a private detective agency and occupied an office in the same building with respondent. Respondent was retained to represent the infant and his father. He filed a retainer statement with this court and continued throughout to be the attorney of record. Respondent, however, retained his brother as counsel, and the latter prepared the case for trial and conducted pretrial negotiations which resulted in a settlement of $30,000 of which $21,000 was for the infant and $9,000 for the father. The net amount for the infant after deduction of attorney's fee ($7,000) was $14,000.

The order of January 6, 1961 approving the settlement of the infant's cause of action directed that two checks each for $7,000 be delivered payable to the father, as guardian ad litem, and an officer of two named banks, respectively, to be deposited in each named bank subject to the further order of the court. For some inexplicable reason the insurance carrier for defendant in the action made the two checks payable solely to the father, as guardian ad litem.

There is substantial proof that at this time (Jan., 1961) respondent was in desperate financial straits. Alliance was threatening him with criminal prosecution if the appropriated moneys were not returned. Furthermore there is clear proof herein, including the testimony of the wife of respondent's brother, that at this time the latter also was in financial difficulties. The brother eventually in January, 1962 entered a State hospital and subsequently was transferred to a Veterans' Hospital where he continued as a patient at the time of the hearing.

We have no difficulty in finding, as did the Referee, that in January, 1961 respondent, his brother, and Ralph Hendler caused the $14,000 belonging to the Hendler infant to be misappropriated and deposited in the bank account of respondent's brother. It is not disputed that a substantial portion of these funds was subsequently disbursed to pay indebtedness of the brother. But there is equally clear proof that a portion of the fund was paid by divers financial manipulations among respondent, his brother and a third party to satisfy in part the indebtedness due by respondent to Alliance.

Ralph Hendler, the father and guardian of the infant, who apparently was a willing participant in the appropriation of this fund of $14,000 was financially rewarded. Commencing in early 1961 and continuing until March or April, 1963 respondent by check or cash made a series of payments to Hendler. Respondent insists that these were loans totaling some two or three

thousand dollars. He admits, however, that none of the amount has been repaid and that Hendler never executed a note or receipt to establish the fact that the money had been borrowed by him. Moreover, in 1961 Hendler filed a petition in bankruptcy prepared by respondent as his attorney. Respondent was not listed in the schedules as a creditor. His testimony was that " I didn't think about it."

Upon the hearing on the charges it was the position of respondent that he did not discover until sometime in 1963 that his brother had appropriated the $14,000. He further testified that he never saw the settlement checks. All of this is just not the truth. There is documentary proof to the contrary. A letter of January 16, 1961 from the attorney for the insurance carrier addressed to respondent and his brother was received in evidence. This listed the five checks totaling $30,000 transmitted therewith. Respondent subsequently admitted that in his handwriting on the original letter is the statement " Received above checks Mervyn J. Schwartz."

The Hendler case, according to respondent, was the largest negligence case in terms of amount involved in which he had ever been retained. He and his brother received a fee of $10,000, representing one third of the total settlement (although the retainer statement filed with this court fixed the fee at 25%), which they divided equally. We have no difficulty in concluding that respondent and his brother with the aid and assistance of Ralph Hendler appropriated the infant's fund of $14,000; that a portion thereof was used by respondent to pay Alliance and the silence of Ralph Hendler was purchased by periodical payments to him by respondent during the ensuing two years.

This conclusion is fortified by the activities of respondent when the storm broke. Some time before June, 1963 Ralph Hendler filed a complaint with the Bar Association. By this time respondent's brother was a patient in an institution. Respondent then conceived the plan of placing the entire blame for the diversion of the funds on his brother. He recognized, however, that an investigation would disclose his need for money to pay Alliance at about the time the Hendler funds were misappropriated. He came forward with the story that a total of $11,300 had been borrowed or received by him from six different sources. To keep this opinion within reasonable length we will discuss only one facet of this proof, although it is doubted that respondent received any part of the $11,300 from any of the stated persons.

At the preliminary investigation and on September 8, 1965 a client and long time friend and business associate of respondent

testified that in January, 1961 he had loaned respondent $5,000 in cash and had accepted his promissory note for that amount; that on June 3, 1963 the indebtedness had been repaid and a receipt so stating had been delivered to respondent. These two documents were produced by the witness. Near the end of the hearing on the charges herein this individual appeared with an attorney and requested permission to recant his former testimony given under oath.

When such permission was granted he related under oath that on June 3, 1963 respondent came to his home and requested that the note and receipt be executed for $5,000 " to cover * * * for some other matter." Both documents, the witness testified, were fabrications and no money was loaned or repaid. We conclude that respondent willfully induced this witness to testify falsely as to a material matter in this disciplinary proceeding.

We concur in the report of the Referee that the proof fully sustains all of the charges, including some not discussed herein. Respondent should be disbarred.

WILLIAMS, P. J., BASTOW, GOLDMAN, DEL VECCHIO and MARSH, JJ., concur.

Report of Referee confirmed and order of disbarment entered.